# ]UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**SYLVIA MARIE ROONEY,**

    **Plaintiff,**

    **v.**                                      **Case No. 18-CV-2030-SCD**

**ANDREW M. SAUL,**
**Commissioner of Social Security,**

    **Defendant.**

---

## DECISION AND ORDER

---

In 2015, Sylvia Marie Rooney applied for Social Security benefits, alleging that she is unable to work due to various physical and mental impairments. Following a hearing, an administrative law judge (ALJ) determined, based primarily on testimony from a vocational expert (VE), that Rooney remained capable of working notwithstanding her impairments. Rooney now seeks judicial review of that decision.

Rooney argues that the ALJ erred in evaluating her alleged symptoms, failing to account for all her limitations, and relying on the VE's testimony. The Commissioner contends that the ALJ did not commit an error of law in reaching his decision and that the decision is otherwise supported by substantial evidence. I agree that the ALJ committed reversible error in discounting Rooney's alleged symptoms and failing to ensure that the VE's testimony was reliable. Because the ALJ's step-five finding is not supported by substantial evidence, the decision denying Social Security benefits to Rooney will be reversed and this matter will be remanded for further proceedings.

## BACKGROUND

Rooney was born on October 5, 1974, in Milwaukee, Wisconsin. R. 18–19, 1174.[1] She dropped out of high school after her freshman year but later obtained her GED and a phlebotomy certification. R. 1174. Rooney worked full-time as a phlebotomist at Wheaton Franciscan Healthcare for twelve years. R. 298. By March 2014, however, chronic back pain was limiting her ability to keep up with her work demands, so she began working reduced hours. R. 306. She worked seventeen-hour weeks until March 28, 2015, when the hospital let her go. R. 295.

A few months later, Rooney applied for disability insurance benefits and supplemental security income from the Social Security Administration (SSA), alleging that she became disabled on March 26, 2014 (when she was thirty-nine years old), the day her hours were reduced. R. 268. Rooney asserted that she was unable to work due to the following conditions: anxiety; depression; insomnia; neck and back pain; spondylolisthesis; sciatica; anterolisthesis; stenosis of the lumbar spine; "neutal"; and arthritis/pain in her neck and shoulder. R. 305. After initially being denied at the local level, *see* R. 53–76, in June 2016, Rooney underwent a psychological consultative examination by Jeremy Meyers, Ed.D., *see* R. 1174–76. A few weeks later, Rooney's applications were denied at the reconsideration level. *See* R. 77–108. Thereafter, she requested an administrative hearing before an ALJ. R. 160–61.

Rooney, along with her attorney, appeared before ALJ Brent C. Bedwell on September 21, 2017. R. 13–52. At the time of the hearing, Rooney was forty-two years old. She was living in a house in Milwaukee with her seventeen-year-old son; she also had two adult-aged children. R. 19, 1175. Rooney was married, but she had been separated from her husband for

---

[1] The transcript is filed on the docket at ECF No. 12-2 to ECF No. 12-31.

several years. R. 20, 269.

Rooney testified that she was unable to work due to anxiety and chronic pain in her back, neck, and shoulders. R. 22–26. She testified that she is unable to sit or stand for prolonged periods of time and that she could not work full-time even if she were permitted to alternate between sitting and standing. R. 32–33. According to Rooney, her pain was aggravated by overdoing activities, like trying to wash dishes or bending over to pick something up. R. 34. Given these difficulties, her son helped with most household chores. R. 28–30. Rooney testified that she also had difficulty driving even five or ten miles. R. 19–20. Because of this limitation, she hadn't been able to visit her brother in Chicago in three or four years, and she had to switch to a closer doctor's office. R. 37. Rooney tried to exercise, doing leg lifts and back stretches, albeit "very slow." R. 30. She also took pain medications, which helped alleviate her pain somewhat—down from a 10/10 to an 8/10—"[b]ut it's always there." R. 24. Likewise, she reported that her spinal cord stimulator trial wasn't very helpful. R. 30.

The ALJ also heard testimony from Spencer Mosley, a vocational expert. According to Mosley, Rooney's phlebotomist job was light on the SSA's exertional scale. R. 40. Mosley testified that a hypothetical person with Rooney's age, education, and work experience could not perform that job if she were restricted to sedentary work (with additional nonexertional limitations) but could change positions between sitting and standing at will. R. 40–41. However, that person could perform other jobs, including, for example, "surveillance systems monitor" (DOT code 379.367-01), "lampshade assembler" (DOT code 39.684-094), and "machine tender" (DOT code 731.685-014). R. 41–44. He estimated that there were approximately 35,000 surveillance systems monitor jobs; 30,000 lampshade assembler jobs;

and 45,000 machine tender jobs in the national economy. Mosley explained that he estimated the number of jobs available by consulting the U.S. Department of Labor's Bureau of Labor Statistics. R. 42, 48. However, to account for the lack of one-to-one correlation between the DOT codes he provided and the job data found in the Bureau of Labor Statistics (which groups multiple DOT codes into a single occupational class, or SOC code), Mosley reduced the total number of jobs for each occupational class by fifty percent. R. 48–49. In this case, he further reduced the job-number estimates to account for the sit-stand option; that reduction was made based on Mosley's twenty-five years of experience placing people with severe disabilities into competitive employment. R. 44–45.

Applying the standard five-step process, *see* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) on February 9, 2018, the ALJ issued a decision concluding that Rooney was not disabled. *See* R. 109–126. The ALJ determined that Rooney had not engaged in substantial gainful activity since March 28, 2015, her amended alleged onset date. R. 114. The ALJ found that Rooney's physical impairments limited her ability to work, but none (alone or in combination) met or equaled the severity of a presumptively disabling impairment. R. 114–116. In finding that Rooney's mental-health impairments did not cause more than a minimal limitation in her ability to perform basic mental work activities, the ALJ assigned "significant weight" to Dr. Meyers's opinion. R. 116.

The ALJ next determined that Rooney had the residual functional capacity (RFC) to perform sedentary work, but

> she must be allowed to change positions between sitting and standing at-will; she is limited to occasional stooping, crouching, kneeling, crawling and climbing of ramps and stairs; she cannot climb ladders, ropes or scaffolds; she cannot do overhead reaching; and she is limited to unskilled work and to jobs having only occasional decision making and changes in work setting.

4

R. 117. In assessing her RFC, the ALJ found that Rooney's claimed symptoms were inconsistent with the objective medical evidence, her improvement with treatment, and her daily activities. R. 118. The ALJ determined that, in light of this RFC, Rooney was unable to perform her past job as a phlebotomist. R. 119–20. But, consistent with the VE's opinion, she could perform other work; therefore, she was not disabled. R. 120–21.

After the SSA's Appeals Council denied review, *see* R. 1–8, making the ALJ's decision the final decision of the Commissioner of Social Security, *see Loveless v. Colvin*, 810 F.3d 502, 506 (7th Cir. 2016), Rooney filed this action on December 27, 2018. ECF No. 1. The matter was reassigned to this court in May 2020 after all parties consented to magistrate-judge jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 29, 30, 31. The matter is fully briefed and ready for disposition. *See* ECF Nos. 13, 25, 26.

## APPLICABLE LEGAL STANDARDS

"Judicial review of Administration decisions under the Social Security Act is governed by 42 U.S.C. § 405(g)." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010)). Pursuant to sentence four of § 405(g), federal courts have the power to affirm, reverse, or modify the Commissioner's decision, with or without remanding the matter for a rehearing.

Section 205(g) of the Act limits the scope of judicial review of the Commissioner's final decision. *See* § 405(g). As such, the Commissioner's findings of fact shall be conclusive if they are supported by "substantial evidence." *See* § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (other citations omitted). The ALJ's decision must be affirmed if it is

5

supported by substantial evidence, "even if an alternative position is also supported by substantial evidence." *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004) (citing *Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992)).

Conversely, the ALJ's decision must be reversed "[i]f the evidence does not support the conclusion," *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) (citing *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003)), and reviewing courts must remand "[a] decision that lacks adequate discussion of the issues," *Moore*, 743 F.3d at 1121 (citations omitted). Reversal also is warranted "if the ALJ committed an error of law or if the ALJ based the decision on serious factual mistakes or omissions," regardless of whether the decision is otherwise supported by substantial evidence. *Beardsley*, 758 F.3d at 837 (citations omitted). An ALJ commits an error of law if his decision "fails to comply with the Commissioner's regulations and rulings." *Brown v. Barnhart*, 298 F. Supp. 2d 773, 779 (E.D. Wis. 2004) (citing *Prince v. Sullivan*, 933 F.2d 598, 602 (7th Cir. 1991)). Reversal is not required, however, if the error is harmless. *See, e.g.*, *Farrell v. Astrue*, 692 F.3d 767, 773 (7th Cir. 2012); *see also Keys v. Barnhart*, 347 F.3d 990, 994–95 (7th Cir. 2003) (citations omitted).

In reviewing the record, this court "may not re-weigh the evidence or substitute its judgment for that of the ALJ." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). Rather, reviewing courts must determine whether the ALJ built an "accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley*, 758 F.3d at 837 (citing *Blakes*, 331 F.3d at 569; *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)). Judicial review is limited to the rationales offered by the ALJ. *See Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95

6

(1943); *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## ANALYSIS

Rooney contends the ALJ erred in (1) evaluating the intensity, persistence, and limiting effects of her alleged symptoms, (2) not accounting for all of Dr. Meyers's opined limitations in the RFC assessment, and (3) relying on the VE's job-number testimony. I will address each argument in turn.

### I.    Subjective-symptom evaluation

Rooney first argues that the ALJ improperly discounted her subjective complaints. ALJs use a two-step process for evaluating a claimant's symptoms. Social Security Ruling (SSR) 16-3p, 2016 LEXIS 4, at *3 (Mar. 16, 2016). First, the ALJ must "determine whether the individual has a medically determinable impairment (MDI) that could reasonably be expected to produce the individual's alleged symptoms." *Id.* at *5. Second, the ALJ must "evaluate the intensity and persistence of an individual's symptoms such as pain and determine the extent to which an individual's symptoms limit his or her ability to perform work-related activities." *Id.* at *9.

Reviewing courts "will overturn an ALJ's decision to discredit a claimant's alleged symptoms only if the decision is 'patently wrong,' meaning it lacks explanation or support." *Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017) (quoting *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014)). "A credibility determination lacks support when it relies on inferences that are not logically based on specific findings and evidence." *Id.* "In drawing its conclusions, the ALJ must 'explain her decision in such a way that allows [a reviewing court] to determine whether she reached her decision in a rational manner, logically based on her specific findings

7

and the evidence in the record." *Murphy*, 759 F.3d at 816 (quoting *McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011)).

Rooney accuses the ALJ of impermissibly "playing doctor" when he evaluated recent diagnostic imaging evidence. *See* ECF No. 13 at 10–12; ECF No. 26 at 1–4. In February 2017—well after the state-agency physicians examined the evidence—Rooney had a CT scan of her lumbar spine that revealed worsening degeneration:

- L3-L4: Dallas grade 4 tear

- L4-L5: Dallas grade 4 tear; asymmetric disc bulge to the left with left foraminal and extra foraminal disc-osteophyte protrusion mildly abutting the exiting left L4 nerve root; no evidence of central canal stenosis; and mild facet arthropathy

- L5-S1: Dallas grade 4 tear; grade 1 anterolisthesis of L5 on S2; diffuse L5-S1 disc bulge with severe degenerative facet and ligamentous hypertrophy contributing to mild canal stenosis and moderately severe bilateral foraminal stenosis

R. 1508; *cf.* R. 564, 773, 777. In his decision, the ALJ summarized the results of the 2017 CT scan without the benefit of an expert opinion. *See* R. 118 (citing 17F/233 [R. 1508]). Those results, in the ALJ's view, did not fully substantiate Rooney's complaints of disabling symptoms because, during that period, "physicians noted normal strength and muscle tone without evidence of sensory deficits . . . and . . . normal coordination and gait with a negative straight leg raise." R. 119.

Rooney maintains that the ALJ was not qualified to interpret the results of 2017 CT scan and that the ALJ impermissibly cherry-picked exam findings that supported his conclusion. I agree. "An ALJ may not conclude, without medical input, that a claimant's most recent MRI results are 'consistent' with the ALJ's conclusions about her impairments." *McHenry v. Berryhill*, 911 F.3d 866, 971 (7th Cir. 2018) (citing *Akin v. Berryhill*, 887 F.3d 314, 317-18 (7th Cir. 2018)); *see also Israel v. Colvin*, 840 F.3d 432, 440 (7th Cir. 2016) ("Because no

8

physician in the record has opined on whether these [MRI] results are consistent with [the claimant's] claim of disabling pain, and because the reports are replete with technical language that does not lend itself to summary conclusions, we cannot say whether the results support or undermine [the claimant's] claim."); *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014) (remanding because the ALJ failed to submit a "new and potentially decisive" MRI to medical scrutiny). In *Akin v. Berryhill*, the Seventh Circuit held that the ALJ impermissibly played doctor when he evaluated MRI results that had not been interpreted by the state-agency physicians. *Akin*, 887 F.3d at 317. The court noted that, "without an expert opinion interpreting the MRI results in the record, the ALJ was not qualified to conclude that the MRI results were 'consistent' with his assessment." *Id.* (citations omitted). The court further explained,

> The MRI results may corroborate [the claimant's] complaints, or they may lend support to the ALJ's original interpretation, but either way the ALJ was not qualified to make his own determination without the benefit of an expert opinion. The ALJ had many options to avoid this error; for example, he could have sought an updated medical opinion. *See Green v. Apfel*, 204 F.3d 780, 782 (7th Cir. 2000). But because the ALJ impermissibly interpreted the MRI results himself, we vacate the judgment and remand this case to the agency.

*Id.* at 317–18.

Without an expert opinion from a medical source regarding the 2017 CT scan, the ALJ here was not qualified to conclude that the diagnostic imaging did not fully substantiate Rooney's alleged disabling symptoms. After the results of that scan came in, Rooney's doctor referred her to spine surgery to discuss surgical options. R. 1525. Because of the multi-level involvement, however, Rooney was determined to not be a good surgical candidate. R. 1579. Having failed conservative treatment—including physical therapy, steroid injections, medial branch blocks, opioids, and anti-depressants—Rooney began a spinal cord stimulator trial. R.

9

1558, 1579. But the trial provided only minimal relief, so a permanent spinal cord stimulator placement was not pursued. *See* R. 30, 1594, 1639. All the while, Rooney continued to complain about debilitating back pain. *See* R. 1514, 1535, 1549, 1570, 1589, 1634. Despite this evidence of more failed treatment and ongoing symptoms, the ALJ neglected to seek an updated medical opinion on the recent imaging results.

The Commissioner argues this case is less like *Akin* and more like *Keys v. Berryhill*, 679 F. App'x 477 (7th Cir. 2017). *See* ECF No. 25 at 9–10. I disagree. In *Keys*, the Seventh Circuit affirmed the denial of Social Security benefits where the state-agency physicians hadn't reviewed "two spinal MRIs showing new 'mild' and 'minimal' narrowing." *Keys*, 679 F. App'x at 481. The court determined that the claimant had failed to explain how those MRIs undermined the physicians' opinions, noting that "[i]f an ALJ were required to update the record any time a claimant continued to receive treatment, a case may never end." *Id.* (citing *Scheck*, 357 F.3d at 702). In this case, however, the ALJ assigned limited weight to the state-agency physicians' opinions in part because of "the recent diagnostic imaging evidence of foraminal stenosis." R. 119. Thus, in contrast to *Keys*, the new evidence here clearly undermined the state physicians' opinions. Given this finding, *Akin* (and like cases) required the ALJ to seek an updated medical opinion, rather than interpret the results of the CT scan himself.

The ALJ attempted to downplay the results of the 2017 CT scan by referencing contemporaneous treatment notes, but in doing so he presented only a one-sided view of the evidence. During the same visits where Rooney demonstrated normal strength, muscle tone, and coordination—observations the ALJ suggested were inconsistent with Rooney's alleged symptoms—she also exhibited decreased range of motion, tenderness, and pain in her lumbar

10

and cervical spine. *See* R. 1521, 1541, 1556–57, 1577, 1592, 1637. The ALJ, however, failed to explain why those negative exam findings were more probative of Rooney's alleged symptoms than the positive ones. After all, having normal strength, muscle tone, and coordination are not inconsistent with the presence of significant pain. Likewise, the ALJ mentioned Rooney having a normal gait and a negative straight-leg raise, *see* R. 119, but ignored other times during this same period where Rooney had an altered gait and positive results on the straight-leg test, *see, e.g.*, R. 1481, 1500, 1520, 1556, 1577. The Commissioner responds that "an ALJ 'is not required to discuss every piece of evidence.'" ECF No. 25 at 10 (quoting *Simila v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2009)). That's generally true. But an ALJ cannot ignore entire lines of evidence that are contrary to his conclusion. *See Hardy v. Berrhill*, 908 F.3d 309, 312 (7th Cir. 2018); *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).

Rooney argues that the ALJ also erred in finding that her daily activities contradicted her alleged symptoms. *See* ECF No. 13 at 13–14; ECF No. 26 at 4–5. I agree. Although the ALJ determined that Rooney was able to "manage a range of daily activities," he never specified what those activities were or explained why they were inconsistent with Rooney's complaints of disabling symptoms. *See* R. 119. The Commissioner points out that elsewhere in the decision the ALJ noted that Rooney "could prepare meals, pay bills, and perform household tasks." ECF No. 25 at 12 (citing R. 115). But that section was devoted to Rooney's alleged mental limitations, specifically her ability to understand, remember, or apply information. The ALJ never explained how these activities were relevant to Rooney's physical condition. Nor did the ALJ discuss the many limitations Rooney reportedly had while engaging in such activities. *See, e.g.*, R. 28–30, 34, 318–26, 337–44.

The ALJ did identify three specific activities he found noteworthy: driving, stretching, and leg-lifting exercises. R. 119. But again, he failed to mention Rooney's limitations engaging in these activities. Rooney testified that her inability to sit for prolonged periods of time made driving even five or ten miles difficult, as she frequently experienced back spasms and pain radiating down her leg. R. 19, 23. Rooney also testified that she changed her doctor's office so that she didn't have to drive as far and that, because of difficulties driving (including the fear of having a panic attack on the freeway), she hadn't visited her brother in Chicago in three or four years. R. 37–38. Similarly, Rooney testified that she performed her doctor-ordered stretches and exercises "[v]ery slow[ly]." R. 30. Because the ALJ ignored Rooney's limitations in performing daily activities, substantial evidence does not support his finding that these activities undermined Rooney's complaints of disabling symptoms.

Finally, Rooney argues that the ALJ misstated the standard of review for evaluating a claimant's subjective symptoms. *See* ECF No. 13 at 14–15; ECF No. 26 at 5–6. After summarizing Rooney's RFC, the ALJ described the correct standard: "the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *See* R. 117 (citing 20 C.F.R. §§ 404.1519, 416.1529 and SSR 16-3p). However, later in the decision, the ALJ twice indicated that Rooney's alleged symptoms were not "fully substantiated" by the record. *See* R. 118, 119. This appears to be a more rigorous standard than the one mandated by Social Security regulations. The Commissioner maintains that a commonsense reading of the decision shows that the ALJ didn't apply a heightened standard. *See* ECF No. 25 at 13–14. I'm not convinced. As Rooney points out, the ALJ's finding of inconsistency with the record—while ignoring evidence that contradicted that finding—implies that the ALJ did not

12

credit Rooney's complaints of disabling symptoms because there was at least some conflicting evidence in the record. Accordingly, it's unclear whether the ALJ applied the correct standard.

In sum, the ALJ's evaluation of the intensity, persistence, and limiting effects of Rooney's alleged symptoms lacks explanation and support in the record. Remand is therefore needed for the ALJ to reevaluate this issue.

## II.     Consultative examination

Rooney next argues that the ALJ's RFC was not consistent with his decision to afford significant weight to the opinions of Dr. Meyers, the psychological consultative examiner. *See* ECF No. 13 at 15–16. With respect to her work capacity, Dr. Meyers concluded that Rooney "should be able to understand and remember simple instructions, but being able to carry them out may be difficult particularly if physical effort is required." R. 1178. The ALJ's decision includes only the first clause; it omits the caveat regarding physical effort. *See* R. 116. Dr. Meyers also concluded that "[w]ithstanding anything more than routine work stress may from time to time test [Rooney's] ability to cope, but she should be able to adapt to the kind of job site changes she would encounter in vocational circumstances suitable to her skill level." R. 1178. The ALJ's decision omits any mention of Dr. Meyers's concern about jobs involving more than routine work stress, stating merely that Rooney "should be able to adapt to workplace changes." R. 116. Rooney takes issue with the lack of explanation for these "key" omissions. She surmises that, had the RFC restricted her from jobs involving more than routine work stress, some of the jobs provided by the VE may have been eliminated.

The ALJ's omission of portions of Dr. Meyers's opinions does not constitute reversible error. Dr. Meyers is a psychologist, not a physician. Thus, his opinion about Rooney's physical ability to carry out simple instructions was outside his area of expertise and, therefore,

13

reasonably not included in the RFC. Moreover, the ALJ reasonably accommodated Rooney's difficulties with work stress by limiting her to unskilled work and only occasional changes in the work setting. *See* R. 117. Rooney speculates without any supporting evidence that the unskilled jobs the ALJ found her capable of performing—surveillance systems monitor, lampshade assembler, and machine tender—caused more than routine stress. Accordingly, any error the ALJ made with respect to Dr. Meyers's opinions was harmless.

### III.    Reliability of the VE's job-number estimates

Finally, Rooney argues that the ALJ erred in relying on the VE's job-number estimates. At step five of the sequential evaluation process, the Commissioner had the burden of demonstrating the existence of significant number of jobs in the national economy that Rooney could perform. *See* 20 C.F.R. §§ 404.1560(c)(1), 416.960(c)(1). To obtain a job-number estimate at Rooney's hearing, the ALJ followed the common path of seeking the assistance of a vocational expert. After classifying Rooney's past work, the VE testified that a person with Rooney's age, education, work experience, and RFC could still work as a surveillance systems monitor, a lampshade assembler, and a machine tender. R. 41–44. According to the VE, those jobs existed in significant numbers in the national economy. He estimated that across the country there were 35,000 surveillance systems monitor jobs; 30,000 lampshade assembler jobs; and 45,000 machine tender jobs. *Id.* The VE arrived at these numbers by reducing the total number of jobs for a particular occupational classification by fifty percent.

14

R. 48–49.[2] In his written decision, the ALJ adopted the job-number estimates provided by the VE at the hearing. *See* R. 120–21.

Rooney maintains that the VE's method is flawed. I agree. "In the context of job-number estimates, . . . the substantial evidence standard requires the ALJ to ensure that the approximation is the product of a reliable method." *Chavez*, 895 F.3d at 968 (citing *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002); *McKinnie v. Barnhart*, 368 F.3d 907, 910 (7th Cir. 2004)). Thus, "[a] finding based on unreliable VE testimony is equivalent to a finding that is not supported by substantial evidence and must be vacated." *Chavez*, 895 F.3d at 968 (quoting *Britton v. Astrue*, 521 F.3d 799, 803 (7th Cir. 2008)). "If the basis of the vocational expert's conclusions is questioned at the hearing, . . . then the ALJ should make an inquiry . . . to find out whether the purported expert's conclusions are reliable." *Donahue*, 279 F.3d at 446. "[A]ny method that the agency uses to estimate job numbers must be supported with evidence sufficient to provide some modicum of confidence in its reliability." *Chavez*, 895 F.3d at 969. The VE here testified that he applies a fifty percent reduction in all cases—that is, even if most of the jobs in the occupational class would not meet the ALJ's hypothetical. However, he failed to explain how this crude methodology yielded sufficiently accurate job-number estimates.

The Commissioner unpersuasively argues that Rooney waived his challenge to the VE's methodology by not sufficiently objecting at the administrative hearing. *See* ECF No. 25 16–17. In her pre-hearing subpoena request, Rooney clearly apprised the ALJ of his concerns about the VE's ability to produce reliable job-number estimates. *See* R. 242–59. At the hearing, the ALJ noted Rooney's objections (though not specifically), R. 40, and Rooney's lawyer

---

[2] In this case, the VE further reduced the job-number estimates to account for the sit-stand option. *See* R. 44–45.

questioned the VE about his methodology, R. 48–49. Following the hearing, Rooney continued to object to the VE's methodology, first in her post-hearing brief, *see* R. 415–17, and later in her written exceptions before the Appeals Council, R. 398–512. These efforts were sufficient to trigger the ALJ's duty to ensure that the VE's estimates were the product of a reliable method. *See Donahue*, 279 F.3d at 446; *see also Courtney v. Berryhill*, 385 F. Supp. 3d 761, 763–64 (W.D. Wis. 2018) (dismissing Commissioner's argument that Plaintiff waived challenge to VE's testimony by not objecting at the hearing because "the claimant does not need to make a formal objection. . . . He needs only to cross-examine the expert and elicit statements that call into question the reliability of his conclusions.").

Because the ALJ failed to ensure that the VE's job-number estimates were the product of a reliable method, his step-five finding is not based on substantial evidence. "[T]hough the VE explained the mathematical operations he performed to arrive at the numbers he provided, he failed to explain why he had any amount of confidence that these mathematical operations yielded sufficiently accurate job-number estimates." *Baird v. Berryhill*, CAUSE NO.: 1:17-CV-472-PRC, 2018 U.S. Dist. LEXIS 173445, at *4 (N.D. Ind. Oct. 9, 2018) (citing *Chavez*, 895 F.3d at 869).

**CONCLUSION**

For all the foregoing reasons, I find that the ALJ erred in evaluating Rooney's alleged symptoms and failed to ensure that the VE's job-number estimates were reliable. Based on this record, however, I cannot determine whether Rooney was disabled as of March 28, 2015. Accordingly, it is necessary to remand this matter to the Commissioner for a new step-five hearing.

16

The Commissioner's decision is **REVERSED**, and this action is **REMANDED** pursuant to sentence four of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), for further proceedings consistent with this decision. The clerk of court shall enter judgment accordingly.

**SO ORDERED** this <u>30th</u> day of June, 2020.

_____
STEPHEN C. DRIES
United States Magistrate Judge

17